P. Jason Collins (PC-3741)
Scott D. Saldaña (*pro hac vice to be filed*)
Jeffrey E. Gross (JG-5200)
Ben A. Barnes (*pro hac vice to be filed*)
REID COLLINS & TSAI LLP
810 Seventh Avenue, Suite 410
New York, NY 10019
Telephone: 212-344-5200
Facsimile: 212-344-5299
Email: jcollins@rctlegal.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| PETER KRAVITZ, as Trustee of the Aegean Litigation Trust, | ) ) ) ) | Case No. _____ |
| Plaintiff, | ) ) | **JURY TRIAL DEMANDED** |
| -against- | ) ) ) | |
| E. NIKOLAS TAVLARIOS, PETER C. GEORGIOPOLOUS, JOHN P. TAVLARIOS, and GEORGE KONOMOS, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## ORIGINAL COMPLAINT

Plaintiff Peter Kravitz, as Trustee of the Aegean Litigation Trust (the "**Trustee**"), brings this action against E. Nikolas Tavlarios, Peter C. Georgiopoulos, John P. Tavlarios, and George Konomos (collectively, the "**Defendants**"), and respectfully alleges as follows:

## I.  <u>SUMMARY OF THE ACTION</u>

1.     This case seeks to recover over $300 million from Defendants for their bad faith dereliction of duty that caused the financial destruction of Aegean Marine Petroleum Network, Inc. (together with its affiliates, "**Aegean**" or the "**Company**"), one of the world's largest marine fuel suppliers. Defendants, former directors and officers of Aegean, had duties to oversee Aegean's business, including duties of care, loyalty, and good faith that required monitoring its systems of internal control, insider transactions, and financial dealings. However, Defendants knowingly abdicated these duties, leaving Aegean's former CEO, Dimitris Melisanidis ("**Melisanidis**"), free to defraud Aegean and manipulate its finances without any monitoring, oversight, or scrutiny. In bad faith dereliction and breach of their duties, Defendants turned their heads as Melisanidis essentially had his way with the Company and rendered it hopelessly insolvent.

2.     Melisanidis ultimately misappropriated over $300 million from Aegean by 2018, enriching himself and his family at the Company's expense.

3.     ***First***, Melisanidis caused Aegean to hire one of his entities, OilTank Engineering and Consulting, Ltd ("**OilTank**"), pursuant to a sham consulting contract. In that agreement, OilTank purported to provide "consulting" services to Aegean in connection with the construction of an in-land oil storage facility. Aegean paid OilTank amounts totaling between $68 million and $126 million—which singlehandedly put the construction project well over budget—and received nothing of value in return (the "**Construction Consultant Fees**").

4.      *Second*, Melisanidis transferred approximately $186 million between Aegean and OilTank or other Melisanidis-controlled companies after the construction project was completed (the "**Post-Construction Transfers**").

5.      *Third*, in order to provide cover for his illicit activity, Melisanidis engineered a massive accounting fraud whereby Aegean accumulated $200 million in fake accounts receivable between 2015 and 2017 from sham entities affiliated with Melisanidis associates (the "**Fake Trade Receivables Scheme**"). In a similar effort to mask his illegitimate transfers, Melisanidis later purported to sell his approximately 22% stake in the Company for approximately $100 million (the "**Share Repurchase**"). But Aegean never actually paid for the shares. Much like the Fake Trade Receivables Scheme, Melisanidis designed the Share Repurchase as an accounting gimmick to further conceal his pillaging of the Company, knowing his Aegean stock was worthless as a result of his own schemes.

6.      Defendants were officers or directors of Aegean during each of these events (the "**Transactions**")—all of which resulted from Defendants' failure to monitor Aegean's systems of internal control, insider transactions, and financial dealings. Defendants were all aware of numerous irregularities and other red flags during their tenure, yet they did nothing to prevent Melisanidis from using his position to denude the Company of value. In addition, Defendants knew of Melisanidis's sordid background, including his extensive criminal history for fraud-related conduct, his suspect business practices, and his propensity for physical violence. But as beneficiaries of Melisanidis's corporate largesse at Aegean's expense,

Defendants were motivated to utterly disregard their fiduciary duties in order to remain in Melisanidis's good graces and continue their symbiotic relationship with him.

7.     Melisanidis's various schemes finally unraveled when a group of activist investors successfully sought the appointment of three independent board members in May 2018. Those board members began an investigation into Aegean's financials (the "**2018 Audit Committee Investigation**") and quickly discovered the existence and extent of Melisanidis's fraudulent activity. By June 2018, the new independent directors discovered that Aegean would need to write off $200 million of its accounts receivable, which were based on sham transactions. Following the completion of the 2018 Audit Committee Investigation, Aegean reported on November 2, 2018, not only that it had booked $200 million in accounts receivable from sham transactions, but also that Melisanidis and/or his affiliates had misappropriated over $300 million from the Company.

8.     The new independent directors did not have more or different authority or investigative powers than Defendants. Had Defendants earlier sought to protect Aegean from Melisanidis as the independent directors later did, they could have prevented Melisanidis's company-destroying wrongdoing.

9.     These revelations ultimately led Aegean to file bankruptcy days later on November 6, 2018. Now the Trustee, on behalf of the Aegean Litigation Trust, brings this lawsuit to recover the hundreds of millions of dollars in damages caused by Defendants' breaches of fiduciary duty.

## II.   <u>JURISDICTION AND VENUE</u>

10.     This Court has original diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2). The amount in controversy exceeds $75,000, exclusive of interest and costs.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because one or more Defendants reside in this District, and much of the conduct at issue in this case occurred in this District. Many of Defendants' acts and practices that give rise to this Complaint substantially occurred in this District. At all relevant times, Aegean had its "principal executive offices" located at 299 Park Avenue in New York, responsible for the Company's ultimate administration, financial reporting, and control functions, including preparation of reports to the Securities and Exchange Commission and other regulatory authorities. In addition, at all relevant times, Aegean's common stock was offered, sold, and traded on the NYSE.

## III.   <u>PARTIES</u>

12.     Plaintiff Peter Kravitz, a citizen of Nevada, was appointed as trustee of the Aegean Litigation Trust on April 3, 2019. On March 29, 2019, the United States Bankruptcy Court for the Southern District of New York entered an order in Case No. 18-13374-MEW (the "**Confirmation Order**") confirming the Joint Plan of Reorganization of Aegean Marine Petroleum Network Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (the "**Plan**"). The Plan became effective on April 3, 2019. The Aegean Litigation Trust was formed pursuant to the Plan and is governed by the Litigation Trust Agreement executed in accordance with the Plan. As set forth in the Plan and the Litigation Trust Agreement, the Aegean

Litigation Trust owns, among other things, the claims of Aegean Marine Petroleum Network, Inc. and its affiliates against their former directors and officers. As trustee of the Aegean Litigation Trust, Mr. Kravitz, in consultation with and subject to the approval of, the trust's advisory board, is, *inter alia*, "responsible for all decisions and duties with respect to the Litigation Trust and the Litigation Trust Assets" and has "power to take any and all actions as, in the Litigation Trustee's reasonable discretion, are necessary or advisable to effectuate the primary purposes of the Litigation Trust."

13.     Defendant E. Nikolas Tavlarios ("**Nikolas Tavlarios**"), a citizen of Connecticut, was Aegean's president and Principal Executive Officer from December 2006 until June 1, 2017. After June 1, 2017, he purportedly stayed on with Aegean as a consultant. At all times relevant to this Complaint, Nikolas Tavlarios worked from Aegean's New York offices. Nikolas Tavlarios filed suit against Aegean in May 2018 in New York County Supreme Court, seeking $1.2 million based on his allegations that Aegean failed to honor the terms of a settlement agreement he purportedly entered into upon resigning his positions at Aegean. Nikolas Tavlarios may be served with process at 26 Indian Spring Road, Norwalk, Connecticut 06853, or wherever he may be found.

14.     Defendant Peter Georgiopoulos ("**Georgiopoulos**"), a citizen of New York, served as chairman of Aegean's board of directors from December 2006 until June 2017. At all times relevant to this Complaint, Georgiopoulos worked from Aegean's New York offices. Georgiopoulos may be served with process at 251 Hammond Road, Millbrook, New York 12545, or wherever he may be found.

15.     Defendant John Tavlarios, a citizen of Connecticut and the brother of Nikolas Tavlarios, served as a member of Aegean's board of directors from December 2006 to June 2017. At all times relevant to this Complaint, John Tavlarios worked from Aegean's New York offices. John Tavlarios may be served with process at 15 Wrenfield Lane, Darien, Connecticut 06820, or wherever he may be found.

16.     Defendant George Konomos ("**Konomos**"), a citizen of New York, served as a member of Aegean's board of directors and as chairman of Aegean's Audit Committee from November 2008 through June 4, 2018, when Aegean announced his removal from the Audit Committee. At all times relevant to this Complaint, Konomos worked from Aegean's New York offices. Konomos may be served with process at 12 E. 86th Street, Apt. 1021, New York, New York 10028, or wherever he may be found.

## IV.   BACKGROUND

### A.   Despite Agreeing to Resign as an Officer and Director in Connection with Aegean's IPO, Melisanidis Retains Control Over the Company.

17.     Melisanidis formed Aegean as an international marine fuel logistics and transportation company in 2005. From June 2005 to December 2006, Melisanidis served as Aegean's president and CEO. He also chaired Aegean's board of directors from June 2005 until July 2006. After acquiring certain of Melisanidis's existing business interests shortly following its formation, Aegean immediately began preparations to raise money through an IPO. Due to Melisanidis's sordid legal and criminal history, however, Aegean's first IPO attempt failed.

18.     Melisanidis has been the subject of numerous criminal indictments—including several felony indictments—for crimes including bribery, forgery, use of

forged documents, and trafficking in contraband, among others. For example, Melisanidis was convicted in 1980 for bribing two players in an amateur soccer game. Similarly, he was convicted in 1988 for participating in the bribery of a civil servant in connection with Melisanidis's operation of a driving school.

19.     Melisanidis's criminal activity also extended to his shipping businesses. In 1999 and 2000, Melisanidis was charged in two felony cases arising from a Greek customs investigation into a series of sham transactions intended to avoid customs duties and taxes by diverting duty free fuel into the domestic Greek oil market that was intended for "transit" vessels stopping at Greek ports only for refueling. Melisanidis's indictment was based on multiple alleged instances of false certifications, forgery, use of forged documents, and trafficking in contraband. He allegedly distributed duty-free fuel intended for transit vessels into the Greek domestic market and conspired with Greek customs officials to falsify certificates showing that duty free fuel was delivered to the transit vessels.

20.     During the same period, Melisanidis was separately indicted for tax evasion based on a similar black-market fuel distribution scheme. For his participation in these criminal conspiracies, Greek customs officials also sought administrative sanctions against Melisanidis for his alleged failure to collect taxes and pay customs duties. At the time of Aegean's IPO, Melisanidis owed approximately $9.5 million to the Greek government for customs violations.

21.     In addition to his connection with black-market fuel transactions, Melisanidis also participated in below-board commercial operations. For instance, the

Greek government charged and convicted Melisanidis in 1999 for illegally operating a condemned warehouse. Melisanidis was also indicted in 2002 for misappropriating the funds of a counterparty to a commercial transaction.

22.     Melisanidis's criminal history further reflects a propensity for physical violence. For example, Melisanidis was indicted in 2000 for making threats of physical violence to union workers during a labor dispute that arose from an explosion, and the resulting death of a laborer, on a Melisanidis-controlled ship.

23.     Melisanidis's criminal record ultimately forced him to formally relinquish his executive positions with Aegean before it could execute a successful IPO, which ultimately commenced on December 13, 2006. Nominally, Melisanidis became Aegean's head of corporate development, where his duties were to be limited to the development of new business.

24.     This illusory transition of power and access was achieved through an oppressive "Framework Agreement" executed in connection with Aegean's IPO that ensured that Melisanidis would maintain power and access with respect to the Company. Pursuant to the Framework Agreement, Georgiopoulos was appointed chairman of Aegean's board of directors and Melisanidis agreed that he would refrain from serving on Aegean's board of directors. The Framework Agreement additionally required Aegean to establish its "principal executive offices" in New York to handle Aegean's administration, financial reporting, and control functions, and where "all levels of the Company and its subsidiaries" would be required to report.

25.     Although Melisanidis agreed to step down from his executive positions at Aegean in connection with the IPO, the Framework Agreement directed Aegean to enter into employment and consulting agreements with Melisanidis reflecting his new role as head of corporate development, in which he was to receive an annual base compensation package worth a total of $250,000, plus additional compensation to be determined annually by Aegean's new board of directors. By comparison, Nikolas Tavlarios was to receive annual base compensation totaling $300,000 in his post-IPO role as Aegean's president and Principal Executive Officer. But the Framework Agreement nonetheless specified that Melisanidis would be required in his new role to report to Aegean's president and board of directors.

26.     Perhaps most egregiously then, the Framework Agreement effectively gave Melisanidis the right to appoint the very executive officers and post-IPO directors to whom he was supposed to report. From the outset, Melisanidis used his power to engineer the appointment of his chosen candidates, including Defendants, to the board of directors and key executive positions at Aegean. Before joining Aegean, each Defendant was a close associate of Melisanidis with knowledge of his suspect background, and each fully understood the terms of the Framework Agreement and the reality that Melisanidis retained power over their own positions at Aegean.

27.     Specifically, prior to joining Aegean, each Defendant was connected to General Maritime Corporation ("**General Maritime**"), a customer responsible for millions of dollars in fuel purchases from Aegean. Georgiopoulos was the president,

CEO, and chairman of the board of directors for General Maritime. John Tavlarios served, at various times, as General Maritime's president, CEO, and COO. Konomos was a member of General Maritime's board of directors, along with Georgiopoulos and John Tavlarios. Nikolas Tavlarios served as the vice president for a General Maritime subsidiary.

28.    Defendants' considerable prior experience with Melisanidis—along with their knowledge of his checkered background that necessitated his resignation of his positions at Aegean prior to the IPO—should have led Defendants to ensure implementation at Aegean of robust internal controls, reporting mechanisms, and oversight procedures to prevent Melisanidis from using the Company to engage in bribery, forgery, fraud, and other criminal conduct. But Melisanidis nonetheless maintained his ability to take advantage of Aegean due to the material breaches of fiduciary duty by Aegean's directors and officers described herein.

29.    As Aegean's directors and officers, Defendants had a duty to exercise oversight and to monitor the corporation's operational viability, legal compliance, and financial performance. In other words, to satisfy their fiduciary duties, Defendants were required to make a good faith effort to implement an oversight system and then monitor it. Defendants' conscious failure to attempt to assure a reasonable information and reporting system existed at Aegean constituted an act of bad faith in breach of Defendants' fiduciary duties, including the duty of care, the duty of loyalty, and the related duty to act in good faith and in the best interest of Aegean and its stakeholders, including its creditors and shareholders. As beneficiaries of

Melisanidis's corporate largesse at Aegean's expense, Defendants were motivated to utterly disregard their fiduciary duties in order to remain in Melisanidis's good graces and continue their symbiotic relationship with him. Throughout their respective tenures, Defendants permitted Melisanidis to pillage the Company through their failure to appropriately monitor his conduct that unfortunately conformed to his prior bad acts.

**B.     Aegean's Construction of the Fujairah Facility Encounters Cost Overruns Due to the Fraudulent Construction Consultant Fees Paid to Melisanidis's Affiliates.**

30.     On April 27, 2010, Aegean announced plans to build an in-land storage facility in Fujairah, United Arab Emirates (the "**Fujairah Facility**"). Melisanidis used the Fujairah Facility construction as an opportunity to pillage Aegean.

31.     First, Melisanidis suspiciously transferred to Aegean—for no consideration—all of the shares of Aegean Oil Terminal Corporation ("**AOTC**"), a company that possessed a 25-year terminal lease agreement with the Municipality of Fujairah. On March 31, 2010, just prior to transferring his AOTC shares to Aegean, Melisanidis had caused AOTC to hire OilTank as a consultant to oversee construction of the Fujairah Facility. But OilTank had no construction consulting experience that would merit such a lucrative contract. Indeed, OilTank was a brand-new company controlled by Melisanidis that was incorporated in the Marshall Islands a mere two weeks before it was retained as a consultant to oversee construction of the Fujairah Facility. As such, OilTank had no ability to provide any engineering, construction, or related services.

32.    Any earnest investigation by Defendants would have uncovered Melisanidis's control over OilTank. For example, OilTank's sole director and major shareholder, Anastasios Tyros, was also an employee of Aegean, where he was responsible for managing the Fujairah Facility. By virtue of his employment with Aegean, Tyros already was obligated to perform any consulting services OilTank provided. Yet Melisanidis caused AOTC to hire OilTank (through Tyros) before AOTC assigned its lease to Aegean.

33.    It also appears that Melisanidis exercised *de facto* control over OilTank, whose employees sought Melisanidis's approval before processing invoices and payments on behalf of the company.

34.    The massive cost overruns the Fujairah Facility project encountered demonstrated both OilTank's inability to perform adequately and Defendants' refusal to exercise any oversight over Aegean or Melisanidis.

35.    When the project began, Aegean estimated it would cost $105 million and take 18 to 24 months. As of December 31, 2010, Aegean had paid advances for construction amounting to $11.6 million, and its remaining contractual obligations totaled $93.2 million.

36.    Initially, construction proceeded according to Aegean's plans. By December 31, 2011, Aegean had paid advances of $40.7 million and reported future contractual liabilities for construction of the Fujairah Facility of $61.2 million. By December 31, 2012, Aegean had paid advances of $99.6 million and reported future contractual liabilities of $10 million. As of April 26, 2013, when Aegean filed its 2012

Form 20F with the Securities Exchange Commission, Aegean still expected construction of the Fujairah Facility to be complete by the end of 2013.

37.     But during 2013, the project budget nearly doubled. By December 31, 2013, Aegean paid advances of $151.8 million for construction of the Fujairah Facility and reported additional future contractual liabilities of $13 million. Without proper oversight or controls by its directors and officers, Aegean's estimated cost to complete the Fujairah Facility increased from approximately $110 million at the end of 2012 to approximately $172 million at the end of 2013. Aegean also reported that the Fujairah Facility would remain under construction until at least the second quarter of 2014, with no explanation for the delay. Aegean finally completed the Fujairah Facility in 2014 at a total cost of $221.9 million, more than double the initial estimate.

38.     For this terrible "performance," Melisanidis caused Aegean to funnel at least $68 million to OilTank to satisfy fake invoices, purportedly for the "consulting" services it provided to AOTC throughout the project. An additional $58 million in expenses related to the construction of the Fujairah Facility remains unaccounted for, funds that, upon information and belief, were also transferred to OilTank and other Melisanidis-controlled entities. None of this $126 million was included in Aegean's initial project cost estimates, and to make matters worse, there is no evidence OilTank provided any legitimate services for the Construction Consultant Fees it received. Instead, Aegean's own employees performed the cost management and consulting duties OilTank was supposed to perform under its agreement with AOTC that yielded OilTank between $68 million and $126 million.

39.     Defendants knew the Fujairah project was tens of millions of dollars overbudget. Yet Defendants did nothing to protect Aegean. They turned a blind eye to Aegean's dealings with OilTank, allowing Melisanidis to use it to misappropriate tens of millions of Aegean's funds to what should have been flagged and monitored as a related party.

40.     The use OilTank put to the money it received from Aegean confirms the improper nature of the payments. Aegean's payment of the Construction Consultant Fees coincided with substantial transfers from OilTank to other Melisanidis affiliates.

41.     For example, in November 2013, a few months after Aegean revealed for the first time that the Fujairah Facility was purportedly overbudget, Melisanidis took control over AEK Athens, a Greek soccer club he previously ran in the mid-90s, to "rebuild" AEK after it dropped two divisions in the country's amateur league due to "huge debts." Melisanidis also helped "secure financing" for a new stadium estimated to cost approximately €60 million—financing that likely included substantial payments from OilTank directly to AEK. On top of financing the stadium, OilTank made direct payments to employees, players and coaches, and vendors on AEK's behalf.

42.     OilTank also provided funds to other Melisanidis affiliates during this period, as well as Grady Properties Corporation SA ("**Grady Properties**"), a company controlled by Melisanidis's son, Georgios Melisanidis. For example, Aegean

paid over $6 million to Grady Properties in January 2014 and received no consideration in return.

43.     Despite their fiduciary obligations to Aegean, Defendants did nothing to stop Melisanidis from using the Fujairah Facility contract to defraud the Company. Because Aegean was required to report related party transactions in its public disclosures, the payments to OilTank constituted a compliance issue intrinsically critical to Aegean's business operations. The failure to identify the substantial payments to OilTank as related party transactions in Aegean's public disclosures further demonstrates that Defendants consciously disregarded their responsibility to oversee and monitor Aegean's operations, and that they failed to ensure that any reasonable information reporting system existed with respect to the construction of the Fujairah Facility.

44.     The 2018 Audit Committee Investigation quickly established that OilTank's "consulting" contract with AOTC was used to misappropriate Aegean funds through inflated contracts and fraudulent pricing. Had the Defendants exercised their fiduciary responsibility to monitor the construction of the Fujairah Facility, they would have arrived at the same conclusion in real time—soon enough to prevent Melisanidis from using the Fujairah Facility construction project to misappropriate between $68 million and $126 million. Instead, when Aegean first reported in April 2014 the Fujairah Facility would cost nearly $175 million instead of $105 million, Defendants did nothing.

45.     Aegean suffered significant harm because of Defendants' failure to oversee and monitor the Company's fraudulent transactions with Melisanidis that followed Melisanidis's prior pattern of fraudulent conduct.

**C.    Melisanidis Causes Aegean to Amass $200 Million in Fake Trade Receivables to Hide Approximately $186 Million in Post-Construction Transfers to His Affiliates.**

46.     Even after Aegean completed the Fujairah Facility in 2014, Melisanidis continued to defraud Aegean by diverting funds to OilTank. From 2015 to 2017, Melisanidis caused the Company to embark on a massive scheme to systematically overstate its receivables as cover for other fraudulent activity involving OilTank and Grady Properties.

47.     To perpetrate the Fake Trade Receivables Scheme, Melisanidis caused Aegean to enter into a series of contracts with four shell entities: Abdul Azim Trading FZE, Miami Exports Group LLC, Savina Maritime Ltd., and South Seas Maritime Ltd. (together, the "**Shell Entities**"). None of the Shell Entities conducted legitimate business with Aegean, and each is affiliated with known associates of Melisanidis.

48.     Through its subsidiary Aegean Marine Petroleum, SA, Aegean entered into approximately 40 contracts with the Shell Entities that facially indicate that Aegean and the Shell Entities would exchange more than 8.05 million metric tons of fuel oil for a total of approximately $2.07 billion.

49.     Under these contracts, the Shell Entities were to sell Aegean "off-spec" fuel oil, which Aegean would blend and sell back to the Shell Entities at a higher price. By feigning these transactions, Aegean was able to amass nearly $200 million

in receivables for fuel oil exchanges that purportedly took place in 2016 and 2017. But no such transactions ever occurred.

50.     A typical oil sale transaction produces substantial documentation, including bunker inspection reports, distribution of samples, final inspection reports, notices of apparent discrepancies, load inspection reports, and shore tank reports, among other documents. No such documents exist to evidence any legitimate transactions between Aegean and the Shell Entities. Even basic monitoring and due diligence by Defendants would have revealed these irregularities.

51.     The scope of Aegean's supposed transactions with the Shell Entities was also infeasible. The agreements between Aegean and the Shell Entities reflect the exchange of over 8.05 million metric tons of marine fuel in 2016 and 2017. The Fujairah Facility's throughput during the same period was just 1.2 million metric tons. It was impossible for Aegean to process the volume contemplated by the contracts.

52.     The Shell Entity receivables also grew at an alarming rate from 2015 to 2017. During that period, Aegean reported trade receivables from the Shell Entities as follows:

| Entity | 2015 | 2016 | 2017 |
|---|---|---|---|
| Abdul Azim Trading FZE | $ 29,504,144.66 | $ 71,071,326.42 | $ 83,104,726.70 |
| Miami Exports Group LLC | $ 18,466,230.99 | $ 55,202,551.39 | $ 63,536,179.33 |
| Savina Maritime Ltd | $ 17,633,989.68 | $ 23,248,134.76 | $ 27,214,762.10 |
| Sout Seas Maritime Ltd | $ 19,394,823.42 | $ 22,472,512.20 | $ 25,786,645.39 |
| Total | $ 84,999,188.75 | $ 171,994,524.77 | $ 199,642,313.52 |

53.     By the end of 2017, Aegean's receivables from the Shell Entities amounted to a significant percentage of the Company's total outstanding receivables. Aegean's outside auditor PricewaterhouseCoopers alerted the Audit Committee to these irregularities in May 2017. Yet the Audit Committee allowed the Company to continue amassing receivables. When the Audit Committee finally engaged outside counsel to review the Company's accounts receivable in November 2017, it was too late. By this time, the Fake Trade Receivables amounted to almost $200 million.

54.     As the receivables from the Shell Entities grew, Melisanidis used the $200 million in fake Company assets as cover to misappropriate Aegean's money for himself and his family. Even though the Fujairah Facility consulting agreement reflected OilTank's only contractual relationship with Aegean, OilTank continued receiving substantial Post-Construction Transfers from Aegean totaling approximately $186 million between June 2015 and January 2018, long after construction of the Fujairah Facility was completed in 2014. Aegean's bank statements reflect that it paid OilTank $82,359,789.99 between July and December 2015, $65,250,896.35 in 2016, $35,800,598.62 in 2017, $900,000.00 on January 14, 2018, and $839,909.09 on January 16, 2018.

55.     Grady Properties—controlled by Melisanidis's son, Georgios Melisanidis—also participated in the Fake Trade Receivables Scheme. Grady Properties received over $30 million in Post-Construction Transfers between 2015 and 2017 from Aegean, even though there is no evidence that Grady Properties ever provided any services to Aegean. In May 2017, Grady Properties transferred

approximately $25 million back into Aegean a week before a scheduled meeting between Aegean and its outside auditors. The Company altered its records to attribute the $25 million payment to Miami Exports Group, LLC, one of the Shell Entities, likely as an attempt to conceal the Fake Trade Receivables Scheme.

56.    The Fake Trade Receivables Scheme masked the illegitimate Post-Construction Transfers and had a substantial effect on the apparent financial health of Aegean. In 2015 and 2016, Aegean posted positive net income. But Aegean's reporting included purported profits from the Fake Trade Receivables Scheme.

57.    Ignoring Aegean's business with the Shell Entities, the Company would have posted a net loss of significant magnitude each year from 2015 to 2017:

| Year | Reported Net Income | Purported Profits from Shell Entities | Net Income without Shell Entities |
|------|------|------|------|
| 2015 | $38.5 million | $91.5 million | ($55.7 million) |
| 2016 | $51.9 million | $135.2 million | ($83.3 million) |
| 2017 | ($38.5 million) | $27.6 million | ($56.2 million) |

58.    Despite the obvious irregularities surrounding Aegean's overstated receivables, Defendants did nothing to investigate how Aegean accumulated $200 million in trade receivables from just four entities, why the receivables grew so quickly, or why Aegean included no allowance for doubtful accounts in its reporting. Nor did they investigate the Company's suspect dealings with Grady Properties.

59.    Instead, as with the ballooning costs associated with the Fujairah Facility, Defendants consciously disregarded their responsibility to oversee and

monitor Aegean's operations, and they failed to ensure that proper controls existed with respect to Aegean's accounting and reporting practices.

60.     The 2018 Audit Committee Investigation quickly identified the Fake Trade Receivables Scheme and concluded that the receivables "lacked economic substance as the [four] counterparties were shell companies with no material assets or operations and were owned or controlled by former employees or affiliates of [Aegean]."

61.     Defendants for years had access to the same information that led to the findings of the 2018 Audit Committee Investigation. Had Defendants exercised their fiduciary responsibility to monitor Aegean's operations, they would have reached the same conclusion as the 2018 Audit Committee Investigation and could have prevented the Fake Trade Receivables Scheme and the Post-Construction Transfers. Instead, in the face of growing trade receivables from the Shell Entities, based on purported oil sales that were impossible for Aegean's facilities to process, Defendants did nothing and allowed the fraud to continue until it was finally exposed by the 2018 Audit Committee Investigation.

## D.     Defendants Allow Melisanidis to Further Obscure Aegean's Financials through a Fraudulent Buyback Scheme.

62.     Adding insult to injury, Defendants took no action to prevent Melisanidis from staging a repurchase of his stake in the Company as an additional measure to conceal the Fake Trade Receivables Scheme. On August 17, 2016, Aegean announced that it had agreed to repurchase Melisanidis's stake in the Company for approximately $100 million. The terms of the Share Repurchase required Aegean to

pay Melisanidis $8.81 per share, based on the share price at the close of trading the previous day. At the time, Melisanidis's approximately 11.3 million shares represented a 22% stake in the Company.

63.    In announcing the Share Repurchase, Nikolas Tavlarios touted that the agreement "underscore[d] the Board's confidence in Aegean's prospects, and [would] provide meaningful and immediate earnings accretion for all Aegean shareholders." He also boasted about Aegean's "solid balance sheet," "which provide[d] [it] the opportunity to repurchase shares."

64.    Contrary to Nikolas Tavlarios's contention that Aegean's balance sheet was in a "solid" position to repurchase Melisanidis's shares, Aegean faced severe liquidity problems within three months of Nikola Tavlarios's announcement, even though it had not actually paid for Melisanidis's shares.

65.    On October 24, 2016, Aegean borrowed $25 million from Grady Properties at a relatively high rate of interest to fund operations. Despite the cash infusion from Grady Properties, Aegean still violated a liquidity covenant with another of its lenders in November 2016 because Aegean's "Borrowing Base"— comprised of cash, inventory, and receivables—sunk too low. To cure the default, Aegean issued $150 million in new securities through a private placement in December 2016, which diluted Aegean's existing shareholders. In other words, the "earnings accretion" Aegean purportedly obtained through its shame purchase of Melisanidis's shares never occurred.

66.    Melisanidis also used OilTank to make the Fake Trade Receivables appear legitimate. During May 2017, OilTank made three payments to Aegean totaling more than $28.4 million. During the same period, Aegean made four payments to OTE totaling $24.5 million. Aegean then falsified its bank statements so that the payments from OilTank appeared to come from Abdul Azim Trading FZE, one of the Shell Entities, thereby reducing its receivable balance.

67.    If Defendants had fulfilled their duty to monitor and oversee the operations of the Company, they would have easily uncovered the fraudulent aspects of the Share Repurchase. Instead, Defendants allowed Melisanidis to further obscure Aegean's financials, deepening the harm caused by Melisanidis's fraud and further concealing the Fraudulent Trade Receivable Scheme.

**E.    Melisanidis's Last-Ditch Effort to Thwart Discovery of His Various Schemes Fails, and the 2018 Audit Committee Investigation Uncovers the Full Scope of His Misdeeds.**

68.    Notwithstanding Melisanidis's efforts to conceal his fraud and Defendants' failure to properly monitor and report on the Company's operations, a group of Aegean investors (the "**Investor Committee**") began to take notice of the Company's financial irregularities starting in 2017. Throughout 2017, the Investor Committee became more active in Aegean's governance, triggering a change in Aegean's board composition. At a June 8, 2017 shareholder meeting, Georgiopoulos and John Tavlarios were voted off Aegean's board of directors along with two other members, leaving the board with only four members. In December 2017, the Investor Committee disclosed in correspondence with Aegean's board that it intended to

nominate four independent directors to Aegean's board at the next shareholder meeting.

69.     In response to the Investor Committee's letters, Melisanidis took swift action to thwart the possibility that newly appointed directors would uncover his fraudulent schemes. On February 28, 2018, Aegean announced its intent to acquire HEC, a company controlled by Melisanidis, for consideration totaling $367 million, with a portion to be paid in Aegean common stock (the "**HEC Acquisition**"). Melisanidis would receive approximately 33% of the outstanding stock of Aegean as a result of the HEC Acquisition. The parties' agreement also conferred Melisanidis with the right to nominate three directors for appointment to Aegean's board and to recommend an additional independent nominee. Further, as a 33% owner of Aegean, Melisanidis would have the ability to form a quorum for voting purposes pursuant to the Company's recently amended bylaws.

70.     The HEC Acquisition represented a blatant attempt by Melisanidis to retain control over Aegean in the face of the Investor Committee's pressure. One stock analyst appropriately characterized the transaction as "indefensible," and wrote that "it is hard to even fathom how any transaction could possibly be worse. . . . This one checks all the boxes: a) they are issuing equity at the worst possible time, b) they are issuing that equity to the one person in the world the company should most avoid dealing with, c) they would be paying at least 300% more than even a conservative fair value, and the list could go on."

71.     In response to the HEC Acquisition, an Aegean shareholder filed suit to enjoin the transaction. On March 12, 2018, the Honorable Loretta A. Preska of the Southern District of New York held a hearing and entered a TRO enjoining the HEC Acquisition. During the hearing, Judge Preska found that "the timing of the transaction is highly suspect [;] [a]fter receiving notice of the [Committee's] decision to nominate a competing slate of directors, the board scheduled the acquisition to close before the annual meeting." Moreover, Judge Preska stated that based on the papers, Melisanidis "stands on both sides of the transaction" insofar as "he exercises *de facto* control over Aegean, the proposed acquirer, and exercises control over the proposed acquiree" and there are "interconnections between the three members of the independent committee and [Melisanidis] and his other companies."

72.     The parties thereafter reached a settlement in which Aegean agreed to appoint three independent directors to the board. The new directors joined the board in May 2018 and were subsequently appointed to Aegean's reconstituted Audit Committee that immediately began the 2018 Audit Committee Investigation. By June 4, 2018, the 2018 Audit Committee Investigation had already revealed that "approximately $200 million of accounts receivable owed to the Company at December 31, 2017 will need to be written off" and that "the transactions that gave rise to the accounts receivable . . . may have been, in full or in part, without economic substance and improperly accounted for in contravention of the Company's normal policies and procedures."

73.     By November 2, 2018, the 2018 Audit Committee Investigation uncovered additional aspects of Melisanidis's fraud. In a press release, the Company announced that "[t]he Audit Committee believes up to US$300 million of Company cash and other assets were misappropriated through fraudulent activities." The Audit Committee identified OilTank as the "principal beneficiary of the misappropriation" and concluded that the "misconduct occurred in part because [Melisanidis] ha[d] exerted significant control over Company personnel and assets through various inappropriate means, including threats of economic retaliation and physical violence."

74.     Aegean's November 2, 2018 press release also disclosed that Aegean had received a grand jury subpoena from the United States Attorney's Office for the Southern District of New York "in connection with suspected felonies." In addition, Aegean announced that the Company's financial statements and disclosures discussing those financial statements "should no longer be relied upon."

75.     Once the full extent of Melisanidis's conduct came to light, it was clear the Company was hopelessly insolvent, rendering it unable to repay the hundreds of millions of dollars of indebtedness it accumulated during the course of Melisanidis's fraud. Unsurprisingly, Aegean filed a Chapter 11 petition just four days later.

76.     Aegean should not have been depending on the appointment of new directors in May 2018 to uncover Melisanidis's fraud. Defendants should have acted long before their appointment to monitor and control Aegean's operations in a manner designed to prevent such misconduct. Defendants, through their bad faith dereliction

of duty, allowed Melisanidis to defraud Aegean of tens of millions of dollars, leaving it hopelessly insolvent.

## V. CAUSES OF ACTION
### COUNT 1: BREACH OF FIDUCIARY DUTY
### *(Against Defendant Nikolas Tavlarios)*

77. The Trustee realleges and incorporates by reference all of the allegations set forth above.

78. As Aegean's president and Principal Executive Officer, Defendant Nikolas Tavlarios owed Aegean fiduciary duties, including the duty of care, the duty of loyalty, and the related duty to act in good faith and in the best interest of Aegean and its stakeholders, including its creditors and shareholders.

79. Nikolas Tavlarios breached his fiduciary duties and failed to act in good faith, as further set forth below.

80. Nikolas Tavlarios breached his duty of care in operating Aegean by approving loss-causing conflicted Transactions based on an incorrect and baseless understanding of the Company's financial position.

81. Nikolas Tavlarios operated Aegean despite (1) failing to inform himself of all material information reasonably available to him regarding Aegean's true financial position, (2) ignoring information demonstrating that Aegean was in a precarious financial position and that the transactions would cause Aegean to suffer harm, and (3) failing to employ a rational process to assess Aegean's financial position and the propriety of the Transactions. Nikolas Tavlarios thus failed to make an informed business judgment in consenting to and approving the Transactions.

82.     Because Nikolas Tavlarios failed to make an informed business judgment before recommending and/or effecting the Transactions, Aegean suffered hundreds of millions of dollars in losses. No rational Officer, in the exercise of his or her informed business judgment, would have operated Aegean in the same manner as Nikolas Tavlarios.

83.     Thus, Nikolas Tavlarios acted with gross negligence, failed to act in good faith, intentionally failed to act in the face of a known duty to act, and acted with conscious disregard for his duties.

84.     As a direct and proximate result of Nikolas Tavlarios's breach of his duty of care, Aegean was damaged in an amount to be proven at trial.

85.     Nikolas Tavlarios also breached his duty of loyalty by failing to monitor Aegean's operations, financial position, accounting systems, reporting, and significant transactions.

86.     Nikolas Tavlarios engaged in a sustained and systematic failure to exercise oversight over Aegean's operations, financial position, accounting systems, reporting, and significant transactions. Aegean's financial statements were materially misstated, conflicted and material loss-causing Transactions were executed on a repeat basis, and Nikolas Tavlarios did nothing to monitor the Company or to prevent the conflicted loss-causing Transactions from being consummated.

87.     Nikolas Tavlarios's conduct demonstrates a conscious disregard for his responsibilities. Nikolas Tavlarios sat by idly and allowed Aegean to suffer through conflicted and material loss-causing Transactions.

88.     As a direct and proximate result of Nikolas Tavlarios's breach of his duty of loyalty, Aegean was damaged in an amount to be proven at trial.

## COUNT 2: BREACH OF FIDUCIARY DUTY
### (Against Defendants Georgiopoulos, John Tavlarios, and Konomos)

89.     The Trustee realleges and incorporates by reference all of the allegations set forth above.

90.     As members of Aegean's board of directors at all times relevant to this Complaint, Defendants Georgiopoulos, John Tavlarios, and Konomos (the "**Directors**") owed Aegean fiduciary duties, including the duty of care, the duty of loyalty, and the related duty to act in good faith and in the best interest of Aegean and its stakeholders, including its creditors and shareholders.

91.     The Directors breached their fiduciary duties and failed to act in good faith, as further set forth below.

92.     The Directors consented to and approved of the Transactions despite (1) failing to inform themselves of all material information reasonably available to them regarding Aegean's financial position and the impact of the Transactions on Aegean, (2) ignoring information demonstrating that Aegean was in a precarious financial position and that the Transactions would cause Aegean to suffer harm, and (3) failing to employ a rational process to assess Aegean's financial position and the

propriety of the Transactions. The Directors thus failed to make an informed business judgment in consenting to and approving the Transactions.

93.     Because the Directors failed to make an informed business judgment and consented to and approved the Transactions, Aegean lost hundreds of millions of dollars. No rational Director, in the exercise of his or her informed business judgment, would have approved the Transactions.

94.     Thus, the Directors acted with gross negligence, failed to act in good faith, intentionally failed to act in the face of a known duty to act, and acted with conscious disregard for their duties.

95.     As a direct and proximate result of the Directors' breach of their duty of care, Aegean was damaged in an amount to be proven at trial.

96.     The Directors also breached their duty of loyalty by failing to monitor Aegean's operations, financial position, accounting systems, reporting, and significant transactions.

97.     The Directors engaged in a sustained and systematic failure to exercise oversight over Aegean's operations, financial position, accounting systems, reporting, and significant transactions. Aegean's financial statements were materially misstated, conflicted and material loss-causing Transactions were executed on a repeat basis, and the Directors did nothing to monitor the Company.

98.     The Directors' conduct demonstrates a conscious disregard for their responsibilities. They sat by idly and allowed Aegean to suffer through conflicted and material loss-causing Transactions.

99.     As a direct and proximate result of the Directors' breach of their duty of loyalty, Aegean was damaged in an amount to be proven at trial.

## VI.   **PRAYER**

The Trustee respectfully requests that this Court enter judgment and grant him the following relief against Defendants:

1.     An award of damages for all losses (currently estimated to exceed $300 million) incurred by Aegean as a result of Defendants' misconduct;

2.     Disgorgement of all compensation paid to Defendants;

3.     All costs incurred in the prosecution of this action as allowed by law;

4.     Attorneys' fees incurred in the prosecution of this action as allowed by law;

5.     Prejudgment and post-judgment interest as allowed by law; and

6.     All other relief to which he is entitled.


Dated: August 27, 2019                    Respectfully submitted,

                                          REID COLLINS & TSAI LLP

                                          */s/ P. Jason Collins*
                                          P. Jason Collins (PC-3741)
                                          Scott D. Saldaña (*pro hac vice to be filed*)
                                          Jeffrey E. Gross (JG-5200)
                                          Ben A. Barnes (*pro hac vice to be filed*)
                                          810 Seventh Avenue, Suite 410
                                          New York, NY 10019
                                          Telephone: 212-344-5200
                                          Facsimile: 212-344-5299
                                          Email: jcollins@rctlegal.com