UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------X
PETER KRAVITZ, in his capacity as
Trustee of the Aegean Litigation
Trust,

              Plaintiff,

      - against -

E. NIKOLAS TAVLARIOS, PETER C.
GEORGIOPOULOS, JOHN P. TAVLARIOS,
and GEORGE KONOMOS,

          Defendants.
--------------------------------X

**MEMORANDUM AND ORDER**

19 Civ. 8438 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

    Aegean Marine Petroleum Network, Inc. (the "Company" or "Aegean") was an international marine fuel logistics company that marketed and supplied fuel to ships in port and at sea. On November 6, 2018, following the Company's disclosure that its founder and former Chief Executive Officer, Dimitris Melisanidis, had defrauded it of several hundred million dollars, the Company filed for bankruptcy in the United States Bankruptcy Court for the Southern District of New York, which confirmed a plan of reorganization on March 29, 2019. The plan of reorganization established the Aegean Litigation Trust, the trustee of which is Peter Kravitz ("plaintiff"), and assigned certain of the Company's claims, including the claims asserted in this case, to it. On September 12, 2019, plaintiff, in his capacity as trustee of the

Aegean Litigation Trust, brought this action against E. Nikolas Tavlarios, Peter C. Georgiopoulos, John P. Tavlarios, and George Konomos (collectively, "defendants"), each of whom was an officer or director of the Company, for breach of fiduciary duty based on their alleged failure to monitor the Company during the period that Melisanidis allegedly defrauded it.[1]  Defendants move to dismiss plaintiff's complaint, which motion the Court grants for the reasons stated herein.

## BACKGROUND

### 1. The Company and Defendants

Melisanidis founded the Company, which was incorporated in the Republic of the Marshall Islands (the "RMI") and headquartered in Greece, in 2005. Compl. ¶ 17.  While he initially served as its Chief Executive Officer and chairman of its board of directors, Melisanidis resigned both positions in 2006 following the Company's unsuccessful attempt at an initial public offering. Compl. ¶ 17.  According to plaintiff, the IPO failed because Melisanidis had a criminal record, including misdemeanor bribery convictions and charges relating to felony tax and customs evasion in Greece, and he resigned in order to enable the Company to

---

[1] Defendants are also named in a related securities litigation pending before the undersigned.  See In re Aegean Marine Petroleum Network, Inc. Sec. Litig., No. 18 Civ. 4993 (NRB).

conduct an IPO.  <u>See</u> Compl. ¶¶ 17-23.

Concurrent with his resignation, Leveret International Inc. ("Leveret"), which Melisanidis owned and which held a majority of the Company's outstanding shares, executed a Framework Agreement with AMPNInvest LLC ("AMPNInvest"), which Georgiopoulos and John Tavlarios controlled and which had purchased a substantial stake in the Company from Leveret.  <u>See</u> Form F-1 (Nov. 3, 2006) at 20-21.  Under the Framework Agreement, Georgiopoulos would serve as chairman of the Company's board of directors, Melisanidis would not serve on the board of directors, Leveret and AMPNInvest would mutually elect seven additional board members, AMPNInvest would choose the chairman of the Audit Committee, and Leveret and AMPNInvest would agree on who would serve as the Company's executive officers and cause the board of directors to appoint them as such.  <u>See</u> Form F-1 (Nov. 3, 2006), Ex. 10.3.  The Framework Agreement also required Leveret and AMPNInvest to cause the Company to hire Melisanidis as the Company's Head of Corporate Development, and to provide a consulting agreement to Melisanidis or a company that he controlled.  <u>See</u> Form F-1 (Nov. 3, 2006), Ex. 10.3.

The Company successfully completed its IPO on December 13, 2006.  Compl. ¶ 23.  Pursuant to the Framework Agreement, E. Nikolas Tavlarios became President and Principal Executive Officer

of the Company, Georgiopoulos became chairman of the board of directors, and Tavlarios became a director, all of whom served in those capacities from December 2006 until June 2017. See Compl. ¶¶ 13-15. Konomos served as director and chairman of the Audit Committee from November 2008 to June 2018. Compl. ¶ 16.

**2. The Board of Directors' Accounting Oversight**

Since its IPO, the Company's board of directors has maintained an audit committee (the "Audit Committee") consisting of three independent directors responsible for "oversight of the work of [the Company's] independent auditors . . . and . . . [its] accounting and financial reporting principles, policies, controls, procedures and practices." E.g., Form 20-F (May 16, 2017) at 67; see also, e.g., Form F-1 (Nov. 3, 2006) at 117-18.

From its IPO until June 20, 2016, the Audit Committee retained Deloitte Certified Public Accountants S.A. as the Company's independent auditor. See Form 20-F (May 16, 2017) at 90; Form F-1 (Nov. 3, 2006) at F-2. Deloitte annually audited the Company's consolidated financial statements in accordance with the standards of the U.S. Public Company Accounting Oversight Board (the "PCAOB"), and each time it issued an unqualified opinion that the financial statements "present[ed] fairly, in all material respects, the financial position of" the Company. See, e.g., Form

20-F (Apr. 26, 2013) at F-2.  Deloitte also annually audited the effectiveness of the Company's internal controls over financial reporting pursuant to PCAOB standards, and, for each year except 2014, it issued an unqualified opinion that "the Company [had] maintained, in all material respects, effective internal control over financial reporting."  See, e.g., id. at F-3.

Deloitte determined that the Company had two material weaknesses in its internal controls in 2014.  Form 20-F (May 15, 2015) at 59.  First, its "controls over the preparation and review of bank reconciliations did not operate effectively and, as a result, [the Company] failed to identify an overstatement of cash and cash equivalents and short-term borrowings caused by a transfer payment within the Company that could not be processed by the bank," the impact of which was a $13.5 million change to the Company's consolidated balance sheet.  See id. at 59-60.  Second, there "was an absence of an effectively-designed control to identify and disclose transactions with new related parties," the consequence of which was a $10.3 million change to the Company's consolidated balance sheet.  See id. at 60.  The Company, under the leadership of defendants, thereafter remediated both material weaknesses, and the following year Deloitte issued an unqualified opinion that "the Company [had] maintained, in all material

respects, effective internal control over financial reporting." Form 20-F (Apr. 28, 2016) at 72, F-3.

The Audit Committee appointed PricewaterhouseCoopers S.A. as the Company's independent auditor on June 20, 2016. See Form 20-F (May 16, 2017) at 90. PwC issued unqualified opinions for 2016 that the Company's financial statements "present[ed] fairly, in all material respects, [its] financial position," and that "the Company [had] maintained, in all material respects, effective internal control over financial reporting." Id. at F-2.

### 3. Melisanidis Allegedly Defrauds the Company

Plaintiff alleges that Melisanidis used various schemes to defraud the Company of approximately $300 million dollars between 2010 and 2017.

### A. The Fujairah Project

On April 27, 2010, the Company announced that it would build a storage facility in Fujairah, United Arab Emirates (the "Fujairah Project"). Compl. ¶ 30. Plaintiff alleges that although the Company initially estimated that the Fujairah Project would cost $105 million and be completed within 18 to 24 months, it ultimately cost $221.9 million and was finished in 2014. Compl. ¶¶ 35, 37.

Plaintiff contends that the Fujairah Project's delayed completion and increased cost were due to Melisanidis using it to

defraud the Company.  See Compl. ¶¶ 3, 31.  Plaintiff alleges that
on March 31, 2010, Melisanidis caused a subsidiary of the Company
to enter a sham consulting contract with OilTank Engineering and
Consulting, Ltd. ("OilTank"), over which Melisanidis allegedly
exercised de facto control, to oversee the storage facility's
construction.  See Compl. ¶¶ 3, 31.  Plaintiff asserts that OilTank
was incorporated just two weeks before the Company hired it, that
it had no construction consulting experience, and that its sole
director and major shareholder was employed by the Company.  Compl.
¶¶ 31-32.  Plaintiff alleges that there is no evidence that OilTank
provided any services to the Company during the Fujairah Project,
but that the Company nonetheless paid it at least $68 million in
satisfaction of allegedly fraudulent consulting invoices.  Compl.
¶¶ 31, 38.  Plaintiff also maintains that $58 million of the
project's $221.9 million cost "remains unaccounted for," and that,
on information and belief, the Company paid it to OilTank or other
entities that Melisanidis allegedly controlled.  Compl. ¶ 38.

**B. The Fake Trade Receivables Scheme**

Plaintiff alleges that following the completion of the
Fujairah Project, between June 2015 and January 2018, the Company
made transfers to OilTank that totaled $186 million, and that to
conceal the transfers, Melisanidis caused the Company to overstate

its accounts receivable by $200 million between 2015 and 2017 (the "Fake Trade Receivables Scheme").  Compl. ¶¶ 4, 46, 54.

Specifically, plaintiff alleges that Melisanidis caused a subsidiary of the Company to enter 40 contracts with four shell entities representing approximately 8.05 million metric tons of fuel oil exchanges between the subsidiary and the shell entities. Compl. ¶¶ 47-48.  According to plaintiff, the shell entities had no economic substance and no fuel oil exchanges ever occurred between the subsidiary and the shell entities, but the contracts caused the Company to accumulate $200 million in accounts receivable between 2015 and 2017.  Compl. ¶ 49.  Plaintiff asserts that the substantial documentation that usually accompanies such transactions does not exist, and that the Fujairah facility's throughput was only 1.2 million metric tons of fuel oil for 2016 and 2017.  Compl. ¶¶ 50-51.

Plaintiff alleges that the Fake Trade Receivables Scheme "masked" the post-Fujairah Project transfers to OilTank until PwC "alerted the Audit Committee to [accounts receivable] irregularities in May 2017," after which the Audit Committee "engaged outside counsel to review the Company's accounts receivable in November 2017."  Compl. ¶¶ 53, 56.

Plaintiff also alleges that between 2015 and 2017, the Company paid Grady Properties, which Melisanidis' son allegedly controlled, more than $30 million, but that there is no evidence that Grady Properties provided any services to the Company during that time. Compl. ¶ 55. Plaintiff asserts that in May 2017, one week before the Company was going to meet with PwC regarding the accounts receivable irregularities, Grady Properties transferred $25 million back to the Company, and that the Company's records were altered to attribute the $25 million transfer to one of the four shell companies. Compl. ¶ 55.

### C. The Share Repurchase and HEC Acquisition

Plaintiff alleges that to conceal the Fake Trade Receivables Scheme further, Melisanidis arranged for the Company to repurchase his 22% stake in the Company for about $100 million in August 2016. Compl. ¶ 62. Plaintiff does not allege how the repurchase would have concealed the Fake Trade Receivables Scheme.

Approximately one year later, on June 1, 2017, E. Nikolas Tavlarios resigned as President and Principal Executive Officer of the Company, Form 6-K (June 2, 2017), and, on June 8, 2017, Gerogiopoulos and John Tavlarios were voted off the board of directors after they failed to receive a majority of the shareholder votes cast at the Company's annual shareholder

meeting, Form 6-K (June 12, 2017).  On December 20, 2017, a group of activist investors sent the Company's board of directors a letter informing it of their intention to nominate four directors for election at the Company's 2018 annual shareholder meeting. See Form 6-K (Dec. 28, 2017), Ex. 99.1.

Plaintiff alleges that on February 28, 2018, in an effort to prevent the activists from nominating a slate of directors, the Company announced its intent to acquire HEC, a company that Melisanidis allegedly controlled, for $367 million.  Compl. ¶ 69. The acquisition would have resulted in Melisanidis owning 33% of the Company's outstanding shares, which allegedly would have empowered him to form a quorum for voting purposes under the Company's bylaws.  Compl. ¶ 69.  The activist investors sued the Company, and, on March 12, 2018, Judge Loretta A. Preska of the Southern District of New York temporarily enjoined the transaction.  See No. 18 Civ. 2085 (LAP), ECF No. 21 (Tr.) at 3-6.  The parties thereafter entered a settlement agreement under which the Company agreed to appoint three independent directors to its board of directors.  Compl. ¶ 72.

### 4. The 2018 Audit Committee Investigation

Plaintiff alleges that the three independent directors joined the board in May 2018 and were appointed to the Audit Committee,

which then commenced an investigation into the Company's finances. Compl. ¶ 72.  Plaintiff alleges that by June 4, 2018, the Audit Committee had determined that the Company would need to write off approximately $200 million of its accounts receivable from transactions with counterparties that lacked economic substance. Compl. ¶ 72.  On November 2, 2018, the Company issued a press release reporting that its Audit Committee, with the assistance of outside legal counsel, forensic accountants, and investigators, believed that "up to US$300 million of Company cash and other assets were misappropriated through fraudulent activities," "the principal beneficiary of the misappropriation [was] OilTank," approximately $200 million of accounts receivable were from transactions that lacked economic substance and "were improperly recorded as part of a scheme to facilitate and conceal an extensive misappropriation of Company assets channeled to OilTank," and that the $200 million was "uncollectible" and had to be written off. Form 6-K (Nov. 2, 2018), Ex. 99.1.  The press release noted that the fraud "involved over a dozen Company employees, including members of senior management," and that "the employees who directed the scheme, which involved the creation of falsified and forged documents . . . [were] terminated."  Form 6-K (Nov. 2, 2018), Ex. 99.1.  The Company filed for bankruptcy four days later.

**5. Procedural History**

On September 12, 2019, plaintiff filed the instant complaint against defendants.  The complaint does not allege that defendants were aware that Melisanidis was defrauding the Company.  Instead, it asserts that they "abdicated" their "duties to oversee Aegean's business," which left Melisanidis "free to defraud Aegean and manipulate its finances without any monitoring, oversight, or scrutiny."  Compl. ¶ 1.  The complaint contends that this alleged failure to oversee the Company "constituted an act of bad faith in breach of [d]efendants' fiduciary duties, including the duty of care, the duty of loyalty, and the related duty to act in good faith," Compl. ¶ 29, and thus asserts a claim for breach of fiduciary duty against each defendant, Compl. at 27-31.

DISCUSSION

**1. Standard of Review**

Defendants move to dismiss the complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  Under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Such pleading "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555.

### 2. Applicable Law

"When a federal district court sits in diversity, it generally applies the law of the state in which it sits, including that state's choice of law rules." In re Coudert Bros. LLP, 673 F.3d 180, 186 (2d Cir. 2012) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)). "New York applies the internal affairs doctrine to claims for breach of fiduciary duty and, thus, applies the law of the state of incorporation to such claims." Marino v. Grupo Mundial Tenedora, S.A., 810 F.Supp. 2d 601, 607 (S.D.N.Y. 2011). The law of the Republic of the Marshall Islands accordingly governs plaintiff's claim for breach of fiduciary duty because the Company is incorporated there.

The RMI statutorily imposes fiduciary duties on the directors and officers of an RMI corporation. Specifically, under the RMI's Business Corporations Act, "[d]irectors and officers shall discharge the duties of their respective positions in good faith and with that degree of diligence, care and skill which ordinarily

prudent men would exercise under similar circumstances in like positions." 52 Marsh. Is. Rev. Code Part I ("BCA"), § 61. Defendants thus owed the Company fiduciary duties under BCA § 61.

The BCA instructs that its provisions, including § 61, "shall be applied and construed to make the laws of the Republic [of the Marshall Islands], with respect to the subject matter hereof, uniform with the laws of the State of Delaware and other states of the United States of America with substantially similar legislative provisions. Insofar as it does not conflict with any other provision of this Act, the non-statutory law of the State of Delaware and of those other states of the United States of America with substantially similar legislative provisions is hereby declared to be and is hereby adopted as the law of the Republic, provided however, that this section shall not apply to resident domestic corporations." BCA § 13. Plaintiff acknowledges that the Company "was a non-resident RMI corporation," hence, that BCA § 13 applied to it. Declaration of James McCaffrey ("McCaffrey Decl.") ¶ 8.

Consequently, and as numerous courts, including the RMI's highest court, have concluded, except to the extent that Delaware law conflicts with a provision of the BCA, Delaware law applies to claims for violations of the BCA where, as here, the RMI

corporation is not a resident of the RMI.  See Rosenquist v. Economou, 3 Marsh. Is. L. Rep. 144, 152 (R.M.I. S. Ct. 2011) ("Rosenquist") (noting that the parties had "correctly agree[d] that Marshall Islands law instructs this Court to look to Delaware corporate law," and applying Delaware law -- and only Delaware law -- in a shareholder derivative action for breach of fiduciary duty (emphasis added)); see also F5 Capital v. Pappas, 856 F.3d 61, 71 n.8 (2d Cir. 2017) ("The Marshall Islands have adopted Delaware corporate law." (citing BCA § 13)); Litwin v. OceanFreight, Inc., 865 F.Supp. 2d 385, 397 (S.D.N.Y. 2011) ("The Marshall Islands . . . adopt Delaware law, except where the [BCA] and the laws of Delaware conflict, in which case the [BCA] controls." (citing BCA § 13 and Rosenquist)); FR 8 Singapore Pte. Ltd. v. Albacore Mar. Inc., 754 F.Supp. 2d 628, 633 (S.D.N.Y. 2010) (concluding the same).  Delaware law thus applies to plaintiff's claim that defendants breached their fiduciary duties under BCA § 61, except to the extent that a provision of the BCA conflicts with it.

Plaintiff, in an effort to avoid the application of Delaware law, resists this conclusion.  Plaintiff bases his resistance on a declaration from RMI attorney James McCaffrey that opines that "RMI courts would not treat a decision from a Delaware court as authority that is any more persuasive than a decision rendered by

a court in another highly-regarded United States jurisdiction like New York or California."  McCaffrey Decl. ¶ 22.

Plaintiff's resistance is futile.  McCaffrey does not even attempt to explain how his opinion coheres with BCA § 13, the plain language of which affords preeminence to Delaware law.  Nor does he articulate how the Court would determine which state's laws would apply, if not Delaware's laws.  Ironically, in arguing that defendants breached their duty of loyalty to the Company, plaintiff argues exclusively under Delaware law.

Moreover, none of the RMI cases on which McCaffrey bases his opinion support it.  Neither Mongaya v. AET MCV Beta LLC, S. Ct. No. 2017-003 (R.M.I. S. Ct. Aug. 10, 2018), nor Chee v. Zhang, High Ct. No. 2016-254 (R.M.I. High Ct. Oct. 16, 2017), concerned the application of the BCA, which is the area of RMI law to which BCA § 13 applies Delaware law absent a conflict with the BCA.  Nor did Samsung v. Focus and Karamehmet, S. Ct. No. 2018-002 (R.M.I. S. Ct. Sept. 6, 2018), which addressed the situs of share ownership for purposes of § 105 of the RMI's Enforcement of Judgments Act, 30 Marsh. Is. Rev. Code Part I, id. at *6-7.  Although Samsung mentioned BCA § 13, it concluded that the BCA did not concern the situs of share ownership, see id. at *19, and adopted the rule embodied in Section 8-112 of the Uniform Commercial Code,

approvingly noting that "all fifty states, including Delaware," had adopted Section 8-112, id. at *24 (emphasis added).

By contrast, the only RMI case mentioned in McCaffrey's declaration that concerned the application of the BCA is Rosenquist, which noted that Delaware law applied under BCA § 13 and, accordingly, applied it. See 3 Marsh. Is. L. Rep. at 152.

Confronting the infirmity of McCaffrey's opinion, plaintiff argues that the Court should deny defendants' motion to dismiss because defendants did not submit an expert opinion on RMI law with their opening brief. However, while "the party claiming foreign law applies carries . . . the burden of proving foreign law to enable to district court to apply it," and while expert testimony "remains the basic mode of proving foreign law," a party is not required to offer such testimony to meet its burden of proving foreign law. See Jones v. Estate of Leven, 116 F.Supp. 3d 314, 330 (S.D.N.Y. 2015) (quotation marks omitted). A party may instead prove foreign law using any means within the scope of information that the Court may consider under Federal Rule of Civil Procedure 44.1, which includes "any relevant material or source, including testimony, whether or not . . . admissible under the Federal Rules of Evidence," Fed. R. Civ. P. 44.1; see also Rationis Enters. Inc. of Panama v. Hyundai Mipo Dockyard Co., Ltd., 426

F.3d 580, 586 (2d Cir. 2005) ("Ultimately, the responsibility for correctly identifying and applying foreign law rests with the court."). Defendants did just that in their opening brief, which cited BCA § 13 and Rosenquist in correctly explaining that the RMI had adopted Delaware corporate law except where it conflicts with the BCA. See ECF No. 43 at 17-18.[2]

### 3. Duty of Care

Defendants contend that plaintiff has failed to state a claim for breach of the duty of care on the ground that the allegations in the complaint give rise only to what Delaware courts refer to as a "Caremark claim," which implicates only a breach of the duty of loyalty. See In re Caremark Int'l Inc. Deriv. Litig., 698 A.2d 959 (Del. Ch. 1996) ("Caremark").

Caremark held that the directors of a corporation "must make a good faith effort to oversee the company's operations." Marchand v. Barnhill, 212 A.3d 805, 820 (Del. 2019) ("Marchand"). This requires that the directors "make a good faith effort to implement an oversight system and then monitor it." Id. at 821. A Caremark

---

[2] Plaintiff also argues that the Court should ignore the expert opinion that defendants submitted with their reply brief. See Declaration of Alastair C. Macaulay. That opinion, however, merely "responds to matters placed in issue by [plaintiff] in [his] opposition brief and does not spring upon [him] new reasons for" the dismissal of his complaint. Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc., 767 F.Supp. 1220, 1235, rev'd on other grounds, 967 F.2d 742 (2d Cir. 1992). Moreover, as is apparent from the Court's analysis, the Court does not rely on it to conclude that Delaware law applies.

claim alleges that the directors failed to do so, i.e., "that the directors allowed a situation to develop and continue which exposed the corporation to enormous legal liability and that in so doing they violated [their] duty to be active monitors of corporate performance." Caremark, 698 A.2d at 967.  Critically, a violation of Caremark's duty to monitor breaches only the duty of loyalty, not the duty of care.  See Stone ex rel. AmSouth Bancorp. v. Ritter, 911 A.2d 362, 370 (Del. 2006) ("Stone") ("It follows that because a showing of bad faith conduct . . . is essential to establish director oversight liability, the fiduciary duty violated by that conduct is the duty of loyalty.").[3]

A claim for breach of the duty of care, by contrast, asserts that a director or officer of the corporation made an uninformed business decision.  See In re Walt Disney Co. Deriv. Litig., 906 A.2d 27, 52 (Del. 2006) (requiring breach of duty of care claims to rebut the presumption that "in making a business decision the directors of a corporation acted on an informed basis" (emphasis added and quotation marks omitted)).  Caremark itself thus distinguished duty of care claims, which "follow from a board

---

[3] Although E. Nikolas Tavlarios was not a director, he, too, was subject to Caremark's duty to monitor because, under Delaware law, the fiduciary duties of officers are identical to those of directors. Gantler v. Stephens, 965 A.2d 695, 708-09 (Del. 2009); see also Caremark, 698 A.2d at 969 (reasoning that "neither corporate boards nor senior officers can be charged with wrongdoing simply for assuming the integrity of employees and the honesty of their dealings on the company's behalf." (emphasis added)).

<u>decision</u> that results in a loss because that decision was ill advised or 'negligent,'" with duty of loyalty claims premised on a failure to monitor, which "arise from an <u>unconsidered failure of the board to act</u> in circumstances in which due attention would . . . have prevented the loss."  698 A.2d at 967 (emphasis in original).

Plaintiff alleges that defendants "abdicated" their "duties to oversee Aegean's business," and thus left Melisanidis "free to defraud Aegean and manipulate its finances without any monitoring, oversight, or scrutiny."  Compl. ¶ 1; <u>see also, e.g.,</u> Compl. ¶ 6 (maintaining that "[d]efendants' failure to monitor Aegean's systems of internal control, insider transactions, and financial dealings" resulted in each of Melisanidis' alleged frauds); Compl. ¶ 45 ("Aegean suffered significant harm because of [d]efendants' failure to oversee and monitor the Company's fraudulent transactions with Melisanidis."); Compl. ¶ 76 ("Defendants should have acted long before . . . to monitor and control Aegean's operations in a manner designed to prevent such misconduct.").

These allegations, which implicate only an alleged failure to monitor the Company, are the basis for plaintiff's claim that defendants breached their fiduciary duties, including their duty of care.  <u>See</u> Compl. ¶ 29 ("Defendants' conscious failure to

attempt to assure a reasonable information and reporting system existed at Aegean constituted an act of bad faith in breach of [d]efendants' fiduciary duties, _including the duty of care_, . . . ." (emphasis added)); Compl. ¶ 1 ("Defendants . . . had duties to oversee Aegean's business, _including duties of care_ . . . ." (emphasis added)); _see also_ ECF No. 45 at 30-31 (identifying defendants' alleged failure to oversee the Company as the grossly negligent conduct that violated the duty of care).

By contrast, plaintiff does not allege that defendants made an uninformed business decision.  To be sure, plaintiff asserts that defendants "failed to make an informed business judgment" regarding the transactions that plaintiff alleges were part of Melisanidis' schemes to defraud the Company.  Compl. ¶¶ 81-82, 92-93.  Such "'labels and conclusions,'" however, are "'naked assertions' devoid of 'further factual enhancement'" that are insufficient to state a claim for a breach of the duty of care. _Iqbal_, 556 U.S. at 678 (quoting _Twombly_, 550 U.S. at 557).

Plaintiff's asserted breach of fiduciary duty claim is accordingly a _Caremark_ claim, which implicates only a breach of the duty of loyalty.  _See In re KSL Media, Inc._, 732 Fed. App'x 535, 536-37 (9th Cir. 2018) (affirming that breach of fiduciary duty claim was a _Caremark_ claim because "[t]he majority of the

-21-

complaint's allegations amount[ed] to purported failures to oversee and actively monitor" and "[a]bsent from the complaint [was] any allegation that [the defendants] made an uninformed business decision."); Welch v. Havenstein, 553 Fed. App'x 54, 55 (2d Cir. 2014) (doing the same where the complaint "targeted" the board's "failure to monitor the corporation" during "the fraud . . . at the heart of the suit," but "ma[de] no particularized allegation that the board took action to approve the fraudulent conduct").  Plaintiff has therefore failed to state a claim for breach of the duty of care.

### 4. Duty of Loyalty

Defendants contend that plaintiff has failed to state his Caremark claim.

The Delaware Supreme Court has repeatedly characterized Caremark claims as "'possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment.'" Stone, 911 A.2d at 372 (quoting Caremark, 698 A.2d at 967).  That is because under Caremark and its progeny, "a showing of bad faith is a necessary precondition to director oversight liability." City of Birmingham Ret. & Relief Sys. v. Good, 177 A.3d 47, 55 (Del. 2017) (emphasis in original and quotation marks omitted).  "Pleadings, even specific pleadings, indicating that

directors did a poor job of overseeing risk in a poorly-managed corporation do not imply director bad faith." In re Gen. Motors Co. Deriv. Litig., C.A. No. 9627 (VCG), 2015 WL 3958724, at *17 (Del. Ch. June 26, 2015). Instead, "to withstand a motion to dismiss, 'only a sustained or systematic failure of the board to exercise oversight -- such as an utter failure to attempt to assure a reasonable information and reporting system exists -- will establish the lack of good faith that is a necessary condition to liability.'" Stone, 911 A.2d at 372 (quoting Caremark, 698 A.2d at 971).

Accordingly, to state a Caremark claim, a plaintiff must plead that "(a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system of controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." Stone, 911 A.2d at 370 (emphasis in original). "In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations." Id.

Defendants first contend that plaintiff has failed to allege that they "utterly failed to implement any reporting or information system or controls." Stone, 911 A.2d at 370. Pleading such an

utter failure is a formidable challenge: the Delaware Supreme Court was "deliberate in its use of the adverb 'utterly' -- a 'linguistically extreme formulation' -- to set the bar high" for pleading a Caremark claim.  Rojas on behalf of J.C. Penney Co., Inc. v. Ellison, C.A. No. 2018-755 (AGB), 2019 WL 3408812, at *9 (Del. Ch. July 29, 2019) ("Rojas").  A plaintiff must allege facts from which it is plausible to infer that the directors "made no effort at all" to implement a board-level system of monitoring. Marchand, 212 A.3d at 821.  Put differently, so long as directors "try" to implement such system, they discharge their duty to monitor the corporation.  Id.  Consequently, "plaintiffs usually lose because they must concede the existence of board-level systems of monitoring and oversight such as a relevant committee, a regular protocol requiring board-level reports about the relevant risks, or the board's use of third-party monitors, auditors, or consultants."  Id. at 823.

Such is the case here.  Plaintiff concedes that the Company's board of directors maintained an Audit Committee of independent directors, and that the Audit Committee, for the life of the Company, retained Deloitte and PwC to audit the Company's consolidated financial statements and the effectiveness of its

internal control over financial reporting.[4]   While plaintiff contends that this system was neither "adequate" nor "appropriate," ECF No. 45 at 32, 35, he does not dispute its existence, which is all that Caremark requires.  See Corporate Risk Holdings LLC v. Rowlands, No. 17 Civ. 5225 (RJS), 2018 WL 9517195, at *5 (S.D.N.Y. Sept. 28, 2018) ("Caremark requires only that a reporting system exist, not even that it be 'reasonable.'" (quoting Central Laborers' Pension Fund v. Dimon, 638 Fed. App'x 34, 37-38 (2d Cir. 2016))).  Any assertion that defendants "made no effort at all," i.e., did not even "try," to implement a board-level system for monitoring the Company's financial reporting and internal controls is thus implausible.  Marchand, 212 A.3d at 821.

Defendants next contend that plaintiff has failed to allege that, "having implemented such a system of controls, [they] consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." Stone, 911 A.2d at 370.  There are two ways that a plaintiff can plead such a conscious failure.

---

[4] Plaintiff's attempt to analogize these measures to the "'routine [FDA] regulatory requirements'" that failed to constitute a board-level system for monitoring food safety in Marchand falls flat.  ECF No. 45 at 35 (quoting Marchand, 212 A.3d at 823).  The Delaware Court of Chancery recently rejected the exact argument that plaintiff asserts in support of that analogy, which this Court rejects for the same reasons as the Court of Chancery.  See In re LendingClub Corp. Deriv. Litig., C.A. No. 12984 (VCM), 2019 WL 5678578, at *9 n.59 (Del. Ch. Oct. 31, 2019).

First, it can allege that the directors "knew that internal controls were inadequate, that the inadequacies could leave room for illegal or materially harmful behavior, and that the board chose to do nothing about the control deficiencies that it knew existed." Desimone v. Barrows, 924 A.2d 908, 940 (Del. Ch. 2007) (Strine, V.C.) ("Desimone").

Plaintiff does not allege any such conscious inaction. On the contrary, after Deloitte determined that there were material weaknesses in the Company's internal controls in 2014, the Company, under the leadership of defendants, remediated the weaknesses, and the following year Deloitte issued an unqualified opinion that the Company's internal controls over financial reporting were effective. Moreover, after PwC "alerted the Audit Committee to [accounts receivable] irregularities in May 2017," the Audit Committee "engaged outside counsel to review the accounts receivable in November 2017." Compl. ¶ 53. While plaintiff protests that the Audit Committee's engagement of outside counsel occurred "too late," Compl. ¶ 53, such engagement rebuffs any contention that the Audit Committee "chose to do nothing" in response to those irregularities, Desimone, 924 A.2d at 940; see Okla. Firefighters Pension & Ret. Sys. v. Corbat, C.A. No. 12151 (VCG), 2017 WL 6452240, at *17 (Del. Ch. Dec. 18, 2017) ("Corbat")

("[I]t is not enough to say the board's response was ineffective.").

Second, a plaintiff can plead that the directors "had clear notice of serious accounting irregularities and simply chose to ignore them." Guttman v. Huang, 823 A.2d 492, 507 (Del. Ch. 2003) (Strine, V.C.). The "typical way" to allege such notice "is to allege facts demonstrating that the board was alerted to 'evidence of illegality -- the proverbial 'red flag.'" Rojas, 2019 WL 3408812, at *10 (quoting South v. Baker, 62 A.3d 1, 15 (Del. Ch. 2012)). The plaintiff must "plead[] with particularity that there were so-called 'red flags' that put the directors on notice of problems with their systems, but which were consciously disregarded." In re Gen. Motors Co. Deriv. Litig., C.A. No. 9627 (VCG), 2015 WL 3958724, at *16 (Del. Ch. June 26, 2015).

Plaintiff lists six purported red flags of Melisanidis' alleged fraud: Melisanidis' criminal history prior to founding the Company in 2005, that Melisanidis had to resign as CEO and director of the Company to enable it to IPO in 2006, that Melisanidis allegedly caused the Company to hire OilTank and pay it $68 million for services that it did not perform, that the Company paid OilTank $168 million after the Fujairah Project's completion, that the Company's contracts with the four shell entities allegedly

required it to process seven times more fuel than it was capable of processing, and that the Company accumulated $200 million in accounts receivable in less than three years. See ECF No. 45 at 33-34.

As an initial matter, Melisanidis' criminal record, which plaintiff alleges consists solely of misconduct that occurred before 2005, see Compl. ¶¶ 18-22, and his resignation from the Company prior to its IPO in 2006, were not red flags in the 2010s when Melisanidis was defrauding the Company. Cf. In re Del Monte Foods Co. S'holders Litig., 25 A.3d 813, 830 (Del. Ch. 2011) ("Time-bound mortals cannot foresee the future."). Moreover, none of the criminal conduct that the complaint attributes to Melisanidis, which is described in greater detail in the Company's November 3, 2006 Form F-1, compare Compl. ¶¶ 18-22 with Form F-1 (Nov. 3, 2006) at 109-11, is remotely comparable to the vast fraud that plaintiff alleges Melisanidis perpetrated on the Company, Melbourne Mun. Firefighters' Pension Trust Fund on Behalf of Qualcomm, Inc. v. Jacobs, C.A. No. 10872 (VCMR), 2016 WL 4076369, at *8 (Del. Ch. Aug. 1, 2016) ("The subsequent complained-of 'corporate trauma' . . . must be sufficiently similar to the misconduct implied by the 'red flags' such that the board's bad faith, 'conscious inaction' proximately caused that trauma."

(quoting South v. Baker, 62 A.3d at 15, 17)), aff'd, 158 A.3d 449 (Del. 2017).

Plaintiff also does not allege that defendants knew that OilTank was not performing the services for which the Company was paying it, that the Company had continued transferring money to OilTank following the completion of the Fujairah Project, or that the contracts with the shell entities required the Company to process more fuel than it could process. Plaintiff instead alleges just the opposite when he asserts that the Fake Trade Receivables Scheme "masked" the transfers to OilTank. Compl. ¶ 56. Directors and officers, however, cannot consciously disregard purported red flags of which they are unaware: "Under Delaware law, red flags 'are only useful when they are either waved in one's face or displayed so that they are visible to the careful observer.'" Wood v. Baum, 953 A.2d 136, 143 (Del. 2008) (quoting In re Citigroup Inc. S'holders Litig., No. 19827 (SPL), 2003 WL 21384599, at *2 (Del. Ch. June 5, 2003)); Corbat, 2017 WL 6452240, at *15 (explaining that the plaintiff must "plead that the board knew of evidence of corporate misconduct -- the proverbial 'red flag'" (emphasis added)). By contrast, the complaint's sole factual contention regarding the knowledge of defendants is that they "knew the Fujairah [P]roject was tens of millions of dollars overbudget,"

which does not plausibly indicate that they knew that someone was using the Fujairah Project as a vehicle to defraud the Company of $126 million, as plaintiff alleges Melisanidis did.  Compl. ¶ 39.

Accordingly, the only asserted red flag of which plaintiff alleges defendants were aware was the $200 million in accounts receivable that the Company had accumulated from the four shell entities.  Plaintiff concedes, however, that after PwC "alerted the Audit Committee to [the] irregularities in May 2017," the Audit Committee "engaged outside counsel to review the Company's accounts receivable in November 2017."  Compl. ¶ 53.  Thus, unlike an assertion that defendants "chose to ignore" the irregular accounts receivable, plaintiff alleges that they responded to them.  Guttman, 823 A.2d at 507; Corbat, 2017 WL 6452240, at *16 (rejecting Caremark claim where plaintiff failed to allege that the board "consciously did nothing in response to the red flags").

With his red flags limp, plaintiff beseeches the Court to infer that defendants consciously disregarded deficiencies in the Company's internal controls because Melisanidis ultimately succeeded in defrauding the Company of hundreds of millions of dollars over a period of years.  Delaware courts, however, refuse to use "the benefit of hindsight . . . to equate a bad outcome with bad faith," Stone, 911 A.2d at 373, and thus "routinely reject

the conclusory allegation that because illegal behavior occurred, internal controls must have been deficient, and the board must have known so," Desimone, 924 A.2d at 821; see also Marchand, 212 A.3d at 821 ("[O]ur case law gives deference to boards and has dismissed Caremark cases even when illegal or harmful company activities escaped detection."). Consequently, "[t]he magnitude and duration of illegal activities or the size of the resulting penalties . . . do not establish either deficient controls or a sustained and systematic conscious failure of oversight," and plaintiff's contention that the Court should conclude otherwise falls flat. In re ITT Corp. Deriv. Litig., 588 F.Supp. 2d 502, 514 (S.D.N.Y. 2008).

The Court accordingly concludes that plaintiff has failed to state his Caremark claim against defendants.[5]

**5. Leave to Amend**

"Although Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend 'shall be freely given when justice so requires,' it is within the sound discretion of the district court to grant or deny leave to amend." McCarthy v. Dun &

---

[5] Because plaintiff has failed to state the only claim in his complaint, the Court declines to consider the propriety of disgorgement as a remedy, as well as whether the statute of limitations bars a breach of fiduciary duty claim based on the Fujairah Project, which issues the parties disputed in their submissions to the Court.

Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007) (quoting Fed. R. Civ. P. 15(a)).  The Second Circuit has consistently stated that a district court may deny leave to amend when a plaintiff requests it in a cursory sentence on the last page of an opposition to a motion to dismiss without any justification or a proposed amended pleading.  See, e.g., Food Holdings Ltd. v. Bank of Am. Corp., 423 Fed. App'x 73, 76 (2d Cir. 2011) (summary order) (affirming district court's denial of leave to amend where the plaintiff had requested leave to amend "on the final page of their brief in opposition to defendants' motion to dismiss, in boilerplate language and without any explanation as to why leave to amend was warranted."); Credit Chequers Info. Servs., Inc. v. CBA, Inc., 205 F.3d 1322 (2d Cir. 2000) (summary order) (denying leave to amend because the plaintiff "ha[d] given no indication of what amendment [was] proposed that would state a valid claim for relief" and had thus "failed to meet its burden of setting forth with particularity the grounds for supporting its motion").

Plaintiff, in the last sentence of his opposition brief and without citation to any legal authority, asks the Court to grant him leave to amend his complaint.  Significantly, plaintiff offers neither a basis for his request nor a proposed amended complaint. See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797

F.3d 160, 190 (2d Cir. 2015) (explaining that courts can deny leave to amend "where the request gives no clue as to how the complaint's defects would be cured" (quotation marks omitted)).  Moreover, on December 5, 2019, after the parties had exchanged pre-motion letters, the Court issued an order granting plaintiff leave to amend his complaint to cure any deficiencies that defendants had identified in their pre-motion letter.  See ECF No. 37. Notwithstanding the benefit of defendants' letter, plaintiff rejected the Court's offer, stating that "none of the issues raised in [d]efendants' pre-motion letter ha[d] any merit."  ECF No. 38.

"While pleading is not a game of skill in which one misstep may be decisive to the outcome, neither is it an interactive game in which plaintiffs file a complaint, and then bat it back and forth with the Court over a rhetorical net until a viable claim emerges."  In re Refco Capital Mkts., Ltd. Brokerage Cust. Sec. Litig., No. 07 Civ. 8686 (GEL), 2008 WL 4962985, at *2 (S.D.N.Y. Nov. 20, 2008) (quotation marks and citations omitted); see also NRW, Inc. v. Bindra, No. 12 Civ. 8555 (RJS), 2015 WL 3763852, at *1 (S.D.N.Y. June 16, 2015) ("To grant leave to amend after a plaintiff has had ample opportunity to amend would be condoning a strategy whereby plaintiffs hedge their bets . . . in the hopes of

having another bite at the proverbial apple." (quotation marks omitted)).

The Court accordingly denies plaintiff's request for leave to amend because he has neither provided a proposed amended complaint nor even tried to explain why an amendment to his complaint would cure any of its deficiencies.

**CONCLUSION**

Defendants' motion to dismiss is granted, and plaintiff's request for leave to amend is denied.  The Clerk of Court is respectfully directed to terminate all motions pending in this case and to close it.[6]

**SO ORDERED.**

Dated:    New York, New York
          July 8, 2020

                              _____
                              NAOMI REICE BUCHWALD
                              UNITED STATES DISTRICT JUDGE

---

[6] Defendants requested oral argument pursuant to this Court's Individual Practices § 2.H.  The Court declines to hear oral argument on this motion given the legal bases on which the Court has resolved it, and because the Court has ruled in favor of the only party that requested oral argument.